THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| JAMES SCOTT,<br><br>        Plaintiff,<br><br>vs.<br><br>DAVID ANGERHOFER et al.,<br><br>        Defendants. | **MEMORANDUM DECISION &<br>ORDER GRANTING REMAINING<br>DEFENDANT BURNHAM'S<br>SUMMARY-JUDGMENT MOTION**<br><br>Case No. 2:20-CV-14-DAK<br><br>District Judge Dale A. Kimball |

  Plaintiff's Second Amended Complaint (SAC), brought primarily under 42 U.S.C.S. § 1983 (2024), is at issue. (ECF No. 22.) Remaining claims of inadequate medical treatment (under the Federal Constitution's Eighth Amendment[1]) and unnecessary rigor (under the Utah Constitution) stem from Plaintiff's interactions with the only remaining defendant, Dr. Bruce Burnham, a past employee of Utah Department of Corrections (UDOC). (*Id.*; Burnham Decl., ECF No. 82-15, at 3.)

  Defendant Burnham now moves for summary judgment, asserting his affirmative defense of qualified immunity as to federal constitutional claims. (ECF No. 83.) That is, he argues he did not violate Plaintiff's clearly established constitutional rights, (*id.*), "creating a presumption that he is immune from suit," *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021) (cleaned up). This shifts the burden to Plaintiff to show otherwise. *See Sawyers v. Norton*, 962 F.3d 1270,

---

[1] The Eighth Amendment reads: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." U.S. Const. amend. VIII.

1282 (10th Cir. 2020). Having thoroughly reviewed the parties' arguments and evidence, the Court concludes his qualified-immunity defense shields Burnham from further litigation here. Due to the Court's prior Order stating that the statute of limitations bars "[a]ll Plaintiff's claims accruing before January 15, 2015," Plaintiff's remaining claims involve any allegations occurring after January 15, 2015. (ECF No. 75, at 19.)

The Court grants Defendant Burnham's summary-judgment motion.

## I. REMAINING ALLEGATIONS

**A.** On October 30, 2017, Plaintiff saw Burnham for neck and back pain, recurring headaches, and difficulty sleeping, regarding which Burnham did not examine Plaintiff's neck and back, "only inadequately examined plaintiff's side for the infection on Plaintiff's back," and "didn't do anything at all for plaintiff's repeated requests for treatment of neck, back and toe pain." (ECF No. 22, at 27, 29.)

**B.** On December 11, 2017, Plaintiff saw Burnham for neck and back pain. (*Id.* at 29.) Plaintiff specified that "his pain had increased significantly after the discontinued use of Amitriptyline and that the current treatment is not sufficient for treating the current level of pain he was experiencing." (*Id.*) Burnham "inconsistently document[ed] that the 'plain films' for C-spine of 2014, T-spine of 2013 and L-Spine of 2009[2] 'all showed quite minimal findings.'" (*Id.*) This documentation diverged from Plaintiff's understanding of how to accurately describe the X-rays. (*Id.* at 29, 31, 33.)

---

[2] Plaintiff asserts, "Plaintiff never received a T-spine 'plain film' xray in 2013. The only xray of Plaintiff's T-spine was on Apr. 3, 2009. . . . Plaintiff never received an L-spine xray in 2009." (ECF No. 22, at 31.) Any discrepancies about types of X-rays taken and when taken are not material facts. In other words, even assuming that the only T-spine xray was taken in 2009, not 2013, and an L-spine xray was never done in 2009, summary judgment is still appropriate for Defendant Burnham.

**C.** On January 3, 2018, Plaintiff had an MRI, ordered by Burnham, "for complete images for the cervical, thoracic and lumbar spine due to Plaintiff's complaints of pain in the neck, mid-back, lower back, hip and shoulder." (*Id.* at 31.) "All three areas of the MRI images are inconsistent with Dr. Burnham's conclusions he made on Dec. 11, 2017." (*Id.* at 33.)

**D.** On January 9, 2018, Burnham did "a chart review for plaintiff's MRI results," in which Burnham "documented that there is 'very minimal findings all three areas'"--conclusions that were "inconsistent with the MRI findings and plaintiff's medical care complaints." (*Id.*)

**E.** On January 12, 2018, Plaintiff saw Burnham for Plaintiff's request for "treatment options for his neck and back which should be evident from the MRI procedure." (*Id.* (cleaned up).) Burnham concluded "that plaintiff's subjective symptoms are discordant with objective findings on MRI and physical examination." (*Id.* at 35 (cleaned up).) Burnham did not do a physical examination and made conclusions "inconsistent with both the MRI findings and Plaintiff's HCR"--i.e., "Burnham did not provide Plaintiff any healthcare . . . during this encounter." (*Id.*)

## II. APPLICABLE LEGAL STANDARDS

### A. Summary Judgment Review

Summary judgment is apt when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court "look[s] at the factual record and the reasonable inferences to be drawn from the record in the light most favorable to the non-moving party." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006).

"Once the moving party has identified a lack of a genuine issue of material fact, the nonmoving party has the burden to cite to specific facts showing that there is a genuine issue for

trial." *May v. Segovia*, 929 F.3d 1223, 1234 (10th Cir. 2019) (cleaned up). "Those specific facts must be supported by particular parts of materials in the record; relying on mere pleadings is insufficient." *Id.* (cleaned up). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Self*, 439 F.3d at 1230 (cleaned up). "When some contradictory evidence exists, the basic summary judgment question is whether a reasonable jury could find for the nonmovant on the disputed issue." *Ortiz v. Torgensen*, 857 F. App'x 419, 421 (10th Cir. 2021) (unpublished).

### B. Qualified Immunity Review

Qualified immunity dictates that an official must have fair notice of the law before liability attaches for violating it. *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002). Two important interests are balanced by qualified immunity: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Questions of qualified immunity should be resolved at the soonest feasible stage of litigation. *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987). Plaintiffs confronting qualified-immunity challenges do not face a higher-than-normal pleading requirement. *Currier v. Doran*, 242 F.3d 905, 916-17 (10th Cir. 2001).

"The doctrine of qualified immunity shields officers from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam) (quoting *Pearson*, 555 U.S. at 231); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It means to shelter "all but the plainly incompetent or those who knowingly violate the law," *City*

*of Tahlequah*, 595 U.S. at 12 (quotation marks and citations omitted), giving ""government officials breathing room to make reasonable but mistaken judgments,""" *Martinez v. Jenneiahn*, No. 22-1219, 2023 U.S. App. LEXIS 17609, at *4 (10th Cir. July 12, 2023) (unpublished) (quoting *City and Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011))).

To be clear, when the qualified-immunity defense is raised, a "plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (cleaned up). "Courts may address these two prongs in any order, and 'if the plaintiff fails to establish either prong . . ., the defendant prevails on the defense.'" *Harrell v. Stitt*, No. 23-6048, 2024 U.S. App. LEXIS 16954, at *9 (10th Cir. July 11, 2024) (unpublished) (quoting *A.M. v. Holmes*, 830 F.3d 1123, 1134-35 (10th Cir. 2016)).

Considering qualified immunity at the summary-judgment phase obliges the Court to accept Plaintiff's factual account supported with evidence and ask if that account is sufficient to prevail over the assertion of qualified immunity. *See Helvie v. Jenkins*, 66 F.4th 1227, 1232 (10th Cir. 2023); *Est. of Taylor v. Salt Lake City*, 16 4th 744, 756 (10th Cir. 2021).

### C. *Pro Se* Plaintiff

*Pro se* pleadings are liberally construed, "applying a less stringent standard than is applicable to pleadings filed by lawyers. Th[e] court, however, will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (citations omitted). This means

that if this Court can reasonably read the pleadings "to state a valid claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). Still, it is not "the proper function of the district court to assume the role of advocate for the *pro se* litigant." *Id.*; *see also Peterson v. Shanks*, 149 F.3d 1140, 1143 (10th Cir. 1998) (citing *Dunn v. White*, 880 F.2d 1188, 1197 (10th Cir. 1989) (per curiam)).

### III. QUALIFIED-IMMUNITY ANALYSIS: CONSTITUTIONAL VIOLATION PRONG

The Court begins and ends its qualified-immunity analysis with the first prong.

#### A. Undisputed Material Facts for This Order Only[3]

**1.** At the relevant time, Burnham "was one of [Plaintiff's] treating physicians during [Plaintiff's] incarceration" by UDOC. (ECF Nos. 22, at 3[4]; 82-15, at 3.)

**2.** On June 12, 2017, Plaintiff received an order for acetaminophen, with the order to expire on June 26, 2018. (UDOC Med. R., ECF No. 11-6, at 3.)

**3.** On October 11, 2017, Plaintiff asked to stop his amitriptyline prescription,[5] due to his belief that it may be causing chronic diarrhea. (ECF No. 82-15, at 10; UDOC Med. R., ECF Nos. 82-3, at 594-95; 82-10, at 35; Pl.'s Decl., ECF No. 97, at 23-24.)

---

[3] The parties set forth facts outside the dates here, but those are irrelevant to the remaining claims. Anything related to outside dates, or state actors other than Burnham, is disregarded as immaterial.

[4] The SAC was signed "under penalty of perjury," declaring "that the information contained therein is true and correct." (ECF No. 22, at 8.) The Court also keeps in mind that "a plaintiff's version of the facts must find support in the record." *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). If the plaintiff's story is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." *Id.*

[5] Burnham explains:

    **4.** On October 27, 2017, Plaintiff submitted a health care request (HCR) for these issues: infection on his back; neck and back pain ("associated with . . . headaches and difficulty sleeping"); HPV warts; penile-cancer concerns; gas; sinus drainage; and fungus on his side. (ECF No. 82-10, at 33; Pl.'s Decl., ECF No. 97-1, at 51.)

    **5.** On October 30, 2017, from 2:48 to 2:52 p.m., Burnham met with Plaintiff. (ECF Nos. 82-3, at 592-94; 82-10, at 32; UDOC Med. R., 82-13, at 114-17; ECF Nos. 82-15, at 10-11; 97-1, at 51.) Burnham did an exam, passively examined Plaintiff's movements,[6] and prescribed medications for the warts. (ECF No. 82-15, at 11.) Burnham noted Plaintiff's record of neck and back pain, and examined him by observing his movements for "indications of muscle weakness, difficulty in walking or movement from sitting to standing, weakness preventing daily tasks without distorting motion [and l]ooking for indicators of paralysis or weakness in his legs which is standard with lower back pain." (ECF Nos. 82-3, at 593; 82-13, at 114-17; 82-15, at 11.) From his observations, Burnham determined stronger pain medication (like Gabapentin or Tramadol)[7]

---

    Amitriptyline is an antidepressant. In low dosages is used to treat chronic neuropathic pain, by relaxing your muscles and reducing the pain signals to the brain. It can be used for back pain, neck pain, and migraines. It is not recommended as a first line treatment, only used when other treatments are unsuccessful.

(ECF No. 82-15, at 7 n.4.)

    [6] Burnham's statement from his declaration is not contradictory to Plaintiff's statement from his declaration, saying, "Nor did Burnham make any *apparent* observations of me or ask me to perform any movements." (ECF Nos. 97-1, at 52 (emphasis added).) Plaintiff's declaration also states, "Burnham did NOT examine Plaintiff for his claim of neck and back pain." (ECF No. 22, at 27.) This appears to be a difference of opinion.

    [7] Burnham explains that Gabapentin "was still considered a controlled substance in Utah until approximately 2020" and Tramadol is "a controlled substance which contains an opioid." (ECF No. 82-15, at 11 nn.7-8.)
    Plaintiff alleges that "Burnham fraudulently claims that plaintiff is 'pushing for gaba, tram for back' . . . . In reality, Plaintiff never mentioned any form of the names of these medications, or requested any of these medications." (ECF No. 22, at 27.) Whether Burnham asserts Plaintiff "pushed" for stronger pain medication, or not, is not a material fact. Therefore, the material facts as designated by the Court reflect the more neutral posture that Burnham considered prescribing stronger pain medications, like Gabapentin and Tramadol, independent of any

than Plaintiff's then-current prescriptions for acetaminophen and amitriptyline[8] was not needed. (ECF Nos. 82-3, at 592-94; 82-13, at 114-17; 82-15, at 11-12.) Burnham also documented "that amitriptyline 'upsets [plaintiff's] stomach and causes diarrhea' and that plaintiff can't take NSAID's." (ECF No. 22, at 27.) Finally, Burnham "only inadequately examined Plaintiff's *side* for the infection on Plaintiff's back." (*Id.* (emphasis in original).)

**6.** On December 6 or 7, 2017, after his amitriptyline prescription was stopped, Plaintiff submitted an HCR for his painful neck and back. (ECF Nos. 82-3, at 592; 82-10, at 9-10; 97-1, at 53.)

**7.** On December 11, 2017, Burnham saw Plaintiff for ongoing complaints of neck, thoracic and lumbar pain, his inability to tolerate amitriptyline for the pain, and a lesion on his mid-back. (ECF Nos. 22, at 29; 82-3, at 590-92; 82-10, at 7-9; 82-13, at 109-12; 82-15, at 12.) Burnham had reviewed Plaintiff's prior thoracic X-ray, from around April 2, 2009, which included a report that

> AP and lateral views of the thoracic spine demonstrate no evidence of fracture or abnormal subluxation. The intervertebral disc spaces are well maintained as is the vertical stature of the vertebral bodies. Mild osteophytic spurring is noted throughout the thoracic spine. Pedicles and spinous processes are intact, and the paravertebral soft tissues are within normal limits.

(Univ. of Utah Med. R., ECF No. 14, at 128; ECF No. 82-15, at 6.) Burnham read the report to mean that the X-ray was "99% normal"; in other words, "[t]here were extremely mild bone spurs

---

preferences expressed by Plaintiff. In other words, the material facts assume that Plaintiff did not ask for stronger pain medication.

[8] The amytriptyline actually had been discontinued on October 11, 2017. (Pl.'s Resp. to Def.'s Summ. J. Mot., ECF No. 97, at 27.)

but everything else was reported as normal." (ECF No. 82-15, at 6.) Burnham physically examined Plaintiff, evaluating "his self-reported pain in each" of various positions, and concluding that Plaintiff's "self-reported symptoms seemed out of proportion to the x-ray and [Burnham's] objective findings."[9] (*Id.* at 12.) But, because "MRIs can show things that x-rays cannot," Burnham "ordered MRIs of the cervical spine." (*Id.*; Univ. of Utah Med. R., 82-12, at 3-8.) Burnham also reviewed Plaintiff's current medication of "Prilosec long-term" and his inability "to take NSAIDs due to his GERD," in deciding that "the best course was to not change his current prescriptions of Acetaminophen and Amitriptyline for his reported pain."[10] (ECF No. 82-15, at 12-16.)

   **8.** On January 3, 2018, at Burnham's request, the University of Utah Health Care did an MRI on Plaintiff's spine. (ECF No. 22, at 31; Univ. of Utah Med. R., 82-2.)

---

[9] Plaintiff "refutes that Burnham performed a physical exam of [Plaintiff's] neck or back. Nor did Burnham ever observe or monitor Scott. Burnham provided no diagnosis, treatment or monitoring during this encounter." (ECF No. 97, at 35.) Viewing the material facts in Plaintiff's favor, the Court accepts Plaintiff's version of the December 11, 2017 encounter that Burnham did not physically examine Plaintiff. However, Plaintiff is not validly able to say that Burnham did not observe him during their minutes in the same space together. The only way that Burnham could absolutely not have observed Plaintiff would be if Burnham was devoid of his five senses, of which there is no such assertion. And Burnham undisputedly did provide medical value stemming from this encounter: he ordered an MRI to see if some objective evidence could possibly support Plaintiff's reports of neck and back pain, when what Burnham had observed did not seem to support Plaintiff's reports. (ECF No. 82-15, at 12.)

[10] Plaintiff "refutes" Burnham's report of what Burnham did in their December 11, 2017 encounter. (ECF No. 97, at 29.) After all, Plaintiff notes, "The entire encounter was less than three (3) minutes. It would be irrational for a trier of fact to believe three (3) minutes is sufficient time for anyone to adequately review all three (3) xray reports, schedule an MRI and perform the alleged 'physical examination' adequately." (*Id.*) But Burnham may very well have reviewed the X-rays and scheduled the MRI outside the three minutes of their encounter. Also, this refutation could also be viewed as a difference of opinion. In his professional medical opinion, Burnham may have believed three minutes was enough time for the encounter for his purposes. Meanwhile, Plaintiff obviously differs, believing that three minutes was not enough time for the encounter. This same reasoning (regarding difference of opinion) applies to other of Plaintiff's arguments in which he asserts that it would be irrational for Burnham to have, for instance, read X-rays a certain way, draw certain conclusions from symptoms and tests, or relied on a certain treatment. (*Id.* at 30-41.)

   The Court also accepts as true Plaintiff's refutation of Burnham's statement that Plaintiff was taking amitriptyline on December 11, 2017. (*Id.* at 35.)

**9.** On January 5, 2018, Plaintiff asked to be seen to discuss back-and-neck-pain treatment options after his MRI. (ECF No. 82-3, at 589; UDOC Med. R., ECF No. 82-11, at 8; ECF No. 82-15, at 14.) UDOC received the MRI results. (ECF No. 82-15, at 13.)

**10.** On January 9, 2018, Burnham's review of Plaintiff's chart shows that Burnham made the following notes: "just got results of MRI of C spine, T spine, LS spine. very minimal findings all 3 areas. nothing to warrant gaba or tram. this is quite consistent with my impressions based on clinical findings. His complaints did seem out of proportion to obj findings. MRI's confirm this impression." (ECF No. 82-11, at 8.) Burnham further explained,

> In noting very minimal findings I was expressing that my reading of the MRIs showed no serious health risk, and failed to identify any previously undiagnosed condition that could explain the patient's pain and provide new avenues to finally identify and treat his condition. The T Spine and L Spine MRI results agreed with [past] x-rays in showing only mild spurring and normal aging, while the C Spine MRI showed [Plaintiff's] inter-vertebral disc degeneration in better detail but did not indicate any condition existed severe enough to require medical intervention. The MRIs did not help us diagnose his pain, in part because his cervical injury was unlikely to be responsible for his lower and mid back pain, and as a result, I determined that the conservative treatment pattern we were using, treating the symptoms as they presented themselves, was still our only option. His results showed some minor abnormalities, but they did not rise to the level of severity that would require additional intervention at this time.

(ECF No. 82-15, at 14.)

**11.** On January 12, 2018, Plaintiff was seen by Burnham for back-and-neck-pain treatment options based on the MRI results. (ECF No. 22, at 33.) "Burnham never performed a physical examination of Plaintiff or even left his desk chair during the entire medical encounter." (*Id.* at 35; ECF No. 97, at 39.) However, Burnham "again observed [Plaintiff's] movements," noting "he did not present evidence of a worsening of his condition." (ECF No. 82-15, at 15.)

Burnham told Plaintiff of his reading of Plaintiff's MRI results "and explained how [they] did not indicate the need for further medical treatment." (*Id.*) Burnham noted that Gabapentin and Tramadol were not warranted,[11] and Plaintiff "was on Acetaminophen and could not tolerate NSAIDs due to his GERD." (*Id.*)

### B. Law Regarding Medical Care for Inmates

To succeed under the Eighth Amendment, Plaintiff must demonstrate acts or omissions harmful enough to show deliberate indifference that offends "evolving standards of decency." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (cleaned up). That amendment proscribes only deliberate indifference constituting the "unnecessary and wanton infliction of pain." *Id.* at 104 (cleaned up). Moreover, Plaintiff must "allege acts or omissions sufficiently harmful to evidence deliberate indifference to *serious* medical needs." *Id.* at 104 (emphasis added). Plaintiff has to show that Defendant's actions were more than negligent. After all, negligent failure to give sufficient medical care, even touching medical malpractice, does not equal a constitutional violation. *Id*. at 106.

*Estelle*'s deliberate-indifference standard has an objective component asking whether the alleged deprivation is "sufficiently serious," and a subjective component asking whether the defendant official "knows of and disregards an *excessive* risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (emphasis added). The subjective component questions whether prison officials acted with a "sufficiently culpable state of mind." *Clemmons v. Bohannon*, 956 F.2d 1523, 1525-26 (10th Cir. 1992). "[E]ven if a prison official has knowledge of a substantial risk of serious harm to inmates, he is not deliberately indifferent to

---

[11] The Court again takes note that Plaintiff did not ask for Gabapentin or Tramadol. (ECF No. 97, at 38.)

that risk unless he is aware of and fails to take reasonable steps to alleviate the risk." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008). Thus, Plaintiff must show he suffered from a serious condition that Defendant knew about and ignored, and that by ignoring Plaintiff's condition, or failing to take reasonable steps to alleviate the risk, Defendant caused Plaintiff serious physical harm or the unnecessary, wanton infliction of pain.

"'[C]ourts are generally reluctant to second guess [professional] medical judgments.'" *Maez v. Merrill*, No. 2:07-CV-986 TC, 2008 U.S. Dist. LEXIS 72842, at *6-7 (D. Utah September 23, 2008) (unpublished) (quoting *Ferranti v. Moran*, 618 F.2d 888, 891 (1st Cir. 1980)); *see Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972). Mere disagreement between a prisoner and prison medical staff as to diagnosis or treatment does not support a deliberate-indifference claim. *Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993); *LeDoux v. Davies*, 961 F.2d 1536, 1536 (10th Cir. 1992). Eighth Amendment violations occur only when medical treatment is so grossly incompetent, inadequate, or excessive as to "shock the conscience or be intolerable to fundamental fairness." *Whitehead v. Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010) (unpublished) (cleaned up). An inmate's belief that he should have been treated differently does not show "deliberate indifference." *Scott v. Gibson*, 37 F. App'x 422, 423 (10th Cir. 2002) (unpublished) (citation omitted).

### C. Applying the Law to the Facts

The essential allegations at issue here are Plaintiff's assertions that, in three particular medical encounters he had with Defendant Burnham during the seventy-seven days between

October 27, 2017 and January 12, 2018, Burnham provided no medical care to him for neck and back pain.[12]

Based on undisputed facts--supported by over 1500 pages of prison and medical records and information, and declarations, that the Court has thoroughly reviewed--Defendant Burnham cannot be termed deliberately indifferent to Plaintiff's requests for treatment of neck and back pain. To the contrary, Defendant met with Plaintiff three times in seventy-seven days, which averages out to a medical encounter every twenty-six days. At each visit, demonstrable treatment of some kind took place--i.e., in-person observations were made (even if they were "passive"); past medical records, prescriptions, and X-rays were reviewed; the current medication of acetaminophen was considered and left in place; and MRI testing was provided and results reviewed.[13]

Far from "deliberate indifference"--"the unnecessary and wanton infliction of pain"-- the record over the three sick visits shows Defendant ensuring treatment for medical issues *every time* Plaintiff asked. *Estelle*, 429 U.S. at 104 (quotation marks & citation omitted). It may not have been the exact medication or dosage or other treatment that Plaintiff wanted,[14] but the

---

[12] Plaintiff also briefly and curtly mentioned (a) a side infection that was inadequately examined, and (b) toe pain, but never developed any further details about these symptoms and whether he considered them serious or how they affected him or caused pain or injury that warrants damages. These two symptoms are therefore not considered further. (ECF No. 22, at 27, 29.)

[13] Plaintiff argues, "Dr. Burnham's conclusion is inconsistent with both the MRI findings and Plaintiff's HCR. . . . Dr. Burnham did not provide Plaintiff any healthcare for his HCR during this encounter." (ECF No. 22, at 35.) But just because Plaintiff does not agree with Burnham's interpretations of X-ray and MRI findings, and how those interpretations helped inform his treatment decisions--i.e., not to prescribe other medication than the acetaminophen Plaintiff was already on--does not mean that Burnham *did not provide any* healthcare treatment and was deliberately indifferent to Plaintiff's medical needs.

[14] Plaintiff "disputes that his current prescription of exclusively Acetaminophen (OTC) was adequate treatment for Scott's numerous spine ailments"; he asserts that Burnham's choice to leave that as Plaintiff's only pain medication was "so cursory it amounted to no treatment at all." (ECF No. 97, at 27.) Again, this is a mere difference of opinion--the opinion of a medical professional versus a nonprofessional.

medical care was uniformly adequate in that Plaintiff's expressed need for help with pain and injury was consistently met by Defendant. *See Olson*, 9 F.3d at 1477 (indicating "difference of opinion" as to diagnosis and treatment not enough to show deliberate indifference). Plaintiff disputes this, but his allegations are entirely unsupported.

Plaintiff's point really is that he, an unqualified layperson, wanted more or different treatment (for example, what he received from past providers[15]) from this medical professional defendant--not, as must be shown to prevail, that Defendant, with full knowledge of deleterious effects of his actions or inactions, outright ignored or even exacerbated Plaintiff's serious medical needs (assuming Plaintiff's needs were serious). *Estelle,* 429 U.S. at 107 (stating, when inmate contended "that more should have been done by way of diagnosis and treatment" and "suggest[ed] a number of options that were not pursued, that was "classic example of a matter for medical judgment . . . and does not represent cruel and unusual punishment").

As a matter of law, offering treatment based on a professional's medical judgment, even if it is not what an inmate wants, does not rise to the level of deliberate indifference. *Self v. Crum*, 439 F.3d 1227, 1232-33 (10th Cir. 2006) ("[T]he subjective component is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment. Matters that traditionally fall within the scope of medical judgment are such

---

[15] For instance, Plaintiff states that he "received previous treatment significantly greater than what was currently being provided for these degenerative injuries. . . . [S]ince transferring to Dr. Burnham's care, comparable treatment [to that provided in the past] is no longer available to Plaintiff." (ECF No. 22, at 31.) Plaintiff also asserts, "Regardless of the MRI findings, Plaintiff has a serious medical condition that is currently causing significant pain and was previously diagnosed and treated. Dr. Burnham's prescribed treatment isn't anything close to the treatment Plaintiff was previously provided and prior to Plaintiff's slip and fall injury, causing Plaintiff to suffer thru unnecessary and significant pain." (*Id.* at 33.)

decisions as whether to consult a specialist . . . [W]here a doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition, an inference of deliberate indifference is unwarranted under our case law."). Also, when records show an inmate has been monitored, attended to, and treated often, the inmate cannot show deliberate indifference.[16] *Wingfield v. Robinson*, No. 10-CV-01375, 2011 U.S. Dist. LEXIS 125825, at *32 (D. Colo. August 10) (missing subjective intent for deliberate indifference when defendants responded to grievances, examined plaintiff, and prescribed treatment more than fifteen times). Here, Plaintiff was consistently evaluated by Defendant. And, the undisputed evidence--Plaintiff's medical records and declarations--shows that Plaintiff received ongoing medical help from Defendant each time his medical issues were raised.

As noted, Plaintiff sues Defendant because he disagrees with the type of examination (passive), the results of Defendant's reviews of tests (different from Plaintiff's), and the treatment offered (relying on acetaminophen for pain). But, an "informed judgment" as to appropriate treatment does not amount to deliberate indifference. *Supre v. Ricketts*, 792 F.2d 958, 963 (10th Cir. 1986). Here, even if Plaintiff could prove that alternative treatment was medically appropriate, Plaintiff still cannot meet his burden of showing Defendant was unreasonable in relying on his own judgment and test results, and administering treatment accordingly.

---

[16] Regarding monitoring, Plaintiff attacks Burnham for "not monitor[ing] Scott's condition after th[e December 11, 2017] encounter." (ECF No. 97, at 49.) However, during that encounter, Burnham ordered an MRI, (ECF No. 97, at 49); on January 5, 2018, Burnham received the results, (ECF No. 82-15, at 13); on January 9, 2018, Burnham reviewed the results, (ECF No. 82-11, at 8); and, on January 12, 2018, Burnham went over the results in person with Plaintiff, (ECF No. 82-15, at 15). So, within four days of the results' arrival, Burnham reviewed them, and, within three days of that review, Burnham saw Plaintiff to share the results and his conclusions. This all happened within a month of the December 11th encounter. Indeed, it is hard to imagine how Burnham could have provided more monitoring of Plaintiff's condition. Again, Plaintiff disagrees with Burnham's professional treatment and opinions, but that, in itself, does not show Burnham was deliberately indifferent.

The undisputed material facts show Defendant was not deliberately indifferent to Plaintiff's requests for medical treatment of his back and neck between October 27, 2017 to January 12, 2018.

### D. Qualified-Immunity Conclusion

In short, after a thorough review of all documents relevant to Defendants' summary-judgment motion, (*see, e.g.*, ECF Nos. 22, 82-83, 97, 101), and based on the undisputed material facts taken in a light most favorable to Plaintiff, the Court concludes that Plaintiff's arguments that Defendant Burnham breached his Eighth Amendment rights--by providing no medical treatment for Plaintiff's neck and back pain from October 27, 2017 to January 12, 2018--fail to meet his burden under the first prong of the qualified-immunity analysis to show that Defendant's conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Tahlequah*, 595 U.S. at 12 (cleaned up). "A defendant is entitled to qualified immunity if the plaintiff fails to satisfy either prong." *Martinez*, 2023 U.S. App. LEXIS 17609, at *5. "Because [Plaintiff] cannot establish a constitutional violation, [the Court] need not reach the clearly established prong of the qualified-immunity analysis." *Harrell*, 2024 U.S. App. LEXIS 16954, at *15 n.6. Thus, Defendant Burnham is protected by the qualified-immunity doctrine from further litigation about Plaintiff's Eighth Amendment claims against him here.

### IV. UNNECESSARY RIGOR CLAIM

Because Plaintiff's federal claims are now dismissed, he has but one pending claim remaining--under the Utah Constitution's unnecessary rigor clause. *See* Utah Const. art. I, § 9 ("Persons arrested or imprisoned shall not be treated with unnecessary rigor.").

The federal statute governing supplemental jurisdiction reads in pertinent part: "The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C.S. § 1367(c) (2024). This statute also provides the period of limitations for a pendent state law claim is "tolled while the claim is pending [in federal court] and for a period of [at least] 30 days after it is dismissed." *Id.* § 1367(d).

In *Dexter*, when the defendants were determined to be immune from suit on the federal claims, the Tenth Circuit declined to consider the plaintiff's claim under the Utah Constitution's unnecessary rigor clause, explaining,

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

*Dexter v. Ford Motor Co.*, 92 F. App'x 637, 644 (10th Cir. 2004) (unpublished) (cleaned up).

For these same reasons, this Court declines to take supplemental jurisdiction over Plaintiff's state-law claim for unnecessary rigor here. With all federal claims having been dismissed, this final claim is more properly evaluated by Utah state courts.

## V. CONCLUSION

Defendant Burnham is entitled to his affirmative defense of qualified immunity.

**IT IS THEREFORE ORDERED** that:

**1.** The summary-judgment motion of the only remaining defendant, Dr. Burnham, is **GRANTED**. (ECF No. 83.)

**2.** Based on qualified immunity, federal constitutional claims against Defendant Burnham are **DISMISSED** with prejudice.

**3.** Plaintiff's state-law claim is **DISMISSED**. Based on its discretion under 28 U.S.C.S. § 1367(c)(3) (2024), the Court declines to extend supplemental jurisdiction over the state-law claim.

**4.** Plaintiff's motions for default judgment are **DENIED**, (ECF Nos. 94, 100). *See Hise v. Philip Morris Inc.*, No. 99-5113, 2000 U.S. App. LEXIS 2497, at *12 (10th Cir. Feb. 17, 2000) ("We believe a summary judgment motion, seeking to dispose of all the issues of a case, is an effort to 'otherwise defend,' and as such, is sufficient to prevent default judgment." (quoting Fed. R. Civ. P. 55(a) ("When a party against whom a judgment for affirmative relief is sought has failed to plead or *otherwise defend*, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." (emphasis added)))); *see also* 10A Wright, Miller & Kane, *Federal Practice & Procedure* § 2682, at 15-17 (4th ed. 2016) (explaining motions challenging pleadings' sufficiency serve to "otherwise defend"); 10 James W. Moore et al., *Moore's Federal Practice* § 55.11[2][b], at 55-20 (3d ed. 2017) (explaining preliminary

motions, like summary-judgment motions, may constitute "otherwise defending" if such motions indicate parties are actively defending against claims).

**5.** No controversy remaining in this Court, this action is **CLOSED**.

DATED this 23rd day of September 2024.

BY THE COURT:

*[signature: Dale A. Kimball]*

JUDGE DALE A. KIMBALL
United States District Court